Argued and submitted May 12, judgment of circuit court reversed, and case remanded to circuit court for further proceedings December 30, 2022

# JACOB KEITH WATKINS,
## *Petitioner-Appellant,*

*v.*

# Richard ACKLEY,
## Superintendent,
## Deer Ridge Correctional Institution,
## *Defendant-Respondent.*

## (CC 20CV27534) (CA A176245) (SC S068825)

523 P3d 86

Petitioner sought post-conviction relief on the ground that his four felony convictions had been based on nonunanimous guilty verdicts and thus violated the rule announced in *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), that the Sixth Amendment prohibits conviction of a crime by a nonunanimous verdict. The post-conviction court denied relief on that claim, holding that the *Ramos* rule was inapplicable to petitioner's convictions because those convictions already were final when *Ramos* was decided. Petitioner appealed, arguing that the post-conviction court had erred in concluding that the jury unanimity rule that had been announced in *Ramos* did not apply retroactively as a basis for post-conviction relief from convictions that already were final when the rule was announced. Petitioner's appeal was certified to the Supreme Court under ORS 19.405, along with two other similar cases, *Huggett v. Kelly*, (A174444)(S068823), and *Jones v. Brown*, (A175780)(S068824). *Held*: The post-conviction court erred in denying relief on petitioner's convictions, which were entered on nonunanimous verdicts, because a conviction that violates the *Ramos* jury unanimity rule, even if it became final before that rule was announced, constitutes a "substantial denial" of a constitutional right which "rendered the conviction[s] void," and thus requires post-conviction relief under ORS 138.530(1)(a)—unless one of the procedural defenses in the Post-Conviction Hearings Act has been raised and sustained.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

On certification from the Court of Appeals under ORS 19.405.* Certification accepted and under advisement on September 16, 2021.

Ryan T. O'Connor, O'Connor Weber LLC, Portland, argued the cause and filed the brief for appellant.

_____

* On appeal from the Jefferson County Circuit Court, Michael R. McLane, Judge.

Rebecca M. Auten, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Chris Perdue, Assistant Attorney General.

Rosalind M. Lee, Portland, filed the brief for *amicus curiae* Oregon Criminal Defense Lawyers Association.

Aliza Kaplan, Portland, filed the brief for *amicus curiae* Criminal Justice Reform Clinic at Lewis & Clark Law School. Also on the brief were Michaela C. Gore, Laney B. Ellisor, Colin Bradshaw, and Bijal Patel.

Anna Sortun, Portland, filed the brief for *amici curiae* Latino Network, Don't Shoot Portland, NAACP Corvallis-Albany Branch #1118, NAACP Eugene-Springfield Branch #1119, NAACP Salem-Keizer Branch #1166, NAACP Portland Chapter 1120B, Black Millennial Movement, Unite Oregon, Immigrant and Refugee Community Organization, and Urban League of Portland.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, and Garrett, Justices, and Baldwin, Senior Judge, Justice pro tempore.**

BALMER, J.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Baldwin, S. J., concurred and filed an opinion.

_____

** DeHoog, J., did not participate in the consideration or decision of this case.

**BALMER, J.**

In *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), the United States Supreme Court held that the Sixth Amendment to the United States Constitution requires that a jury reach a unanimous guilty verdict to convict a defendant of a crime. Since that decision, this court, as the highest court in one of two jurisdictions that have permitted criminal defendants to be convicted by nonunanimous juries,[1] has been dealing with its implications. Until now, we have considered questions about *Ramos*'s effect only in cases that have come before us on direct appeal and review—that is, cases that were still pending on appeal when *Ramos* was decided—meaning that any violation of the rule announced in *Ramos* could be raised before the judgment of conviction became final. *See, e.g.*, *State v. Williams*, 366 Or 495, 466 P3d 55 (2020) (defendant's conviction based on nonunanimous jury verdict was plain error, and court's exercise of discretion to review the error and reverse the conviction was warranted); *State v. Ulery*, 366 Or 500, 464 P3d 1123 (2020) (same); *State v. Flores Ramos*, 367 Or 292, 478 P3d 515 (2020) (although jury instruction that defendant could be convicted on nonunanimous jury verdict was constitutional error, defendant was not entitled to reversal of conviction when jury's guilty verdict was unanimous; convictions based on nonunanimous verdicts must be reversed). Today, we consider the effect of *Ramos* in a case that comes to us in a different posture: an appeal from a trial court's rejection of a post-conviction petitioner's challenge to convictions that were obtained through nonunanimous verdicts. Petitioner raised the issue as soon as *Ramos* was decided—but years after the challenged convictions had become final. The issue on appeal thus

---

[1] Article I, section 11, of the Oregon Constitution expressly permits a criminal defendant to be convicted by a nonunanimous jury verdict, unless the charge is first-degree murder. The relevant part of Article I, section 11, states:

"Provided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first[-]degree murder, which shall be found only by a unanimous verdict, and not otherwise; provided further, that the existing laws and constitutional provisions relative to criminal prosecutions shall be continued and remain in effect as to all prosecutions committed before the taking effect of this amendment."

concerns the so-called "retroactivity"[2] of the constitutional rule announced in *Ramos* in a post-conviction proceeding under ORS 138.510 to 138.680.

The Court of Appeals certified the appeal to this court, as provided in ORS 19.405. This court accepted the certification, and we now hold that, when a petitioner seeks post-conviction relief, on Sixth Amendment grounds, from a judgment of conviction which was based on a nonunanimous verdict and which became final before the Supreme Court's *Ramos* decision issued, the petitioner is entitled to relief—assuming that none of the procedural defenses in the Post-Conviction Hearings Act have been raised and sustained. That is so because convicting a defendant on a nonunanimous jury verdict amounts to a "substantial denial in the proceedings resulting in petitioner's conviction *** of petitioner's rights under the Constitution of the United States *** which denial rendered the conviction void," for which post-conviction relief "shall be granted." ORS 138.530(1)(a).[3]

---

[2] The term "retroactivity" is misleading. As the Supreme Court explained in *Danforth v. Minnesota*, 552 US 264, 271, 128 S Ct 1029, 169 L Ed 2d 859 (2008):

"'Retroactivity' suggests that when we declare that a new constitutional rule of criminal procedure is 'nonretroactive,' we are implying that the right at issue was not in existence prior to the date the 'new rule' was announced. But this is incorrect. As we have already explained, the source of a 'new rule' is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule. What we are actually determining when we assess the 'retroactivity' of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought."

Because courts (including this court) have tended to use "retroactivity" as shorthand for the concept, the term is difficult to avoid. But, when possible, we attempt to describe the concept in more accurate terms.

[3] In its entirety, ORS 138.530(1) provides:

"Post-conviction relief pursuant to ORS 138.510 to 138.680 shall be granted by the court when one or more of the following grounds is established by the petitioner:

"(a) A substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void.

"(b) Lack of jurisdiction of the court to impose the judgment rendered upon petitioner's conviction.

"(c) Sentence in excess of, or otherwise not in accordance with, the sentence authorized by law for the crime of which petitioner was convicted; or unconstitutionality of such sentence.

## I.   HISTORICAL FACTS

In 2011, petitioner was convicted of four felonies, all based on verdicts that were not unanimous. At that time, the prevailing understanding was that a nonunanimous guilty verdict did not violate a criminal defendant's Sixth Amendment right to a jury trial, *Apodaca v. Oregon*, 406 US 404, 92 S Ct 1628, 32 L Ed 2d 184 (1972), and petitioner did not raise any objection to the nonunanimous verdicts in the trial court, in his unsuccessful direct appeal, or in the trial and appeal of his first, unsuccessful post-conviction petition. But after the Supreme Court announced in *Ramos* that the Sixth Amendment prohibited criminal convictions based on nonunanimous verdicts, petitioner filed a second post-conviction petition, raising claims that (1) his convictions based on nonunanimous verdicts violated his Sixth Amendment right to a jury trial; (2) because of the discriminatory origins of Oregon's constitutional provisions allowing conviction by a nonunanimous verdict, his conviction by a nonunanimous jury also violated his rights under the Equal Protection Clause of the Fourteenth Amendment; (3), (4) his trial and appellate counsel had each been constitutionally inadequate in failing to raise challenges to the nonunanimous guilty verdicts in anticipation of a change in the Supreme Court's view of the constitutionality of such verdicts; and (5) the trial court's instruction that the jury could convict on nonunanimous verdicts constituted structural error.

The state moved for summary judgment on all five claims.[4] The state argued that petitioner's equal protection claim was barred by the statute of limitations and other procedural bars in the Post-Conviction Hearing Act (PCHA), ORS 138.510 to 138.680,[5] but it notably did *not* raise those procedural bars against petitioner's remaining claims. On the inadequate assistance of counsel claims, the

---

"(d) Unconstitutionality of the statute making criminal the acts for which petitioner was convicted."

[4] While ORS 138.570 provides that a petition for post-conviction relief "shall name as defendant the official charged with the confinement of the petitioner," in this opinion, we refer to "the state" as the defendant.

[5] The state also argued that petitioner had failed to present evidence of any disparate impact that would support an equal protection claim.

state argued that, given the state of the law at the time of petitioner's trial and appeal, counsel had not been constitutionally deficient in failing to challenge the constitutionality of petitioner's convictions by nonunanimous verdicts and, in any event, petitioner had not been prejudiced by counsels' failure to raise such challenges. And on the two claims that relied directly on *Ramos*—the first and fifth claims just outlined—the state argued that: (1) under then-applicable federal analysis, the rule announced in *Ramos* would not apply "retroactively" to convictions that already were final when that case was decided because the rule is neither a new substantive rule of constitutional law nor a new "watershed" rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding;[6] and (2) under *Page v. Palmateer*, 336 Or 379, 386, 84 P3d 133 (2004), that, at least for new rules of criminal procedure that are drawn from the United States Constitution, federal retroactivity analysis applies in petitioner's state post-conviction proceeding.[7]

Petitioner conceded that the two inadequate assistance claims could not be sustained but resisted the motion for summary judgment as it applied to the remaining claims, arguing, on various grounds, that post-conviction relief is available in Oregon for petitioners whose convictions were obtained in violation of the rule announced in *Ramos*, even for convictions that became final before the *Ramos* decision issued. The post-conviction court granted the state's motion for summary judgment, briefly explaining that, in its view, (1) the rule in *Ramos* "does not apply retroactively to cases

---

[6] *See Teague v. Lane*, 489 US 288, 311-13, 109 S Ct 1060, 103 L Ed 2d 334 (1989) (describing the general rule in federal habeas corpus proceedings that newly announced constitutional rules do not apply retroactively to convictions that already were final when rule was announced, with exceptions for new substantive rules and "watershed" rules of criminal procedure). The Supreme Court has since abandoned the "watershed" rules of criminal procedure exception, *Edwards v. Vannoy*, ___ US ___, 141 S Ct 1547, 1560, 209 L Ed 2d 651 (2021), meaning that, in federal habeas cases, only new substantive rules apply retroactively.

[7] The state acknowledged that, shortly after this court concluded in *Page* that Oregon was bound to apply the federal retroactivity rule in state post-conviction proceedings, the Supreme Court announced in *Danforth*, 552 US at 280-81, that state courts are free to apply broader retroactivity rules in their own state's post-conviction proceedings. But the state argued that, because *Page* was this court's last word on the issue, it still controlled in Oregon.

on collateral review"; and (2) petitioner had not produced evidence sufficient to create an issue of fact as to whether he could not have reasonably raised his equal protection claim at an earlier time or proceeding.

Petitioner filed a notice of appeal and then moved jointly with the state for certification of the appeal to this court, as provided in ORS 19.405 and ORAP 10.10. As noted, the Court of Appeals granted that motion and certified the appeal, and this court accepted the Court of Appeals' certification.

Before this court, petitioner challenges only the post-conviction court's refusal to grant relief on his first claim—the claim that, because his convictions were based on nonunanimous jury verdicts, they were obtained in violation of the Sixth Amendment, which is applicable to defendants under the Fourteenth Amendment, as decided in *Ramos*. Because the import of *Ramos* is undeniable and the state has not argued that some other bar to relief (such as the *res judicata* bars set out in ORS 138.550) applies,[8] the issue before this court is a narrow one: Did the post-conviction court err in denying relief for that constitutional violation, based on its conclusion that the rule of *Ramos* "does not apply retroactively" to convictions that already were final when *Ramos* issued?

## II.   LEGAL BACKDROP

On the question whether a convicted person can obtain retroactive relief in post-conviction for the state's violation of a federal constitutional rule that was not judicially recognized until after the person was convicted, Oregon law is not clear. Much of the confusion stems from uncertainty about whether and how the *federal* "retroactivity" doctrine is binding in state court proceedings. As we described in *Chavez*

---

[8] Neither is there any question that *Ramos* announced a new constitutional rule, rather than simply applying an existing rule to a particular set of facts. *See Chaidez v. United States*, 568 US 342, 347-48, 133 S Ct 1103, 185 L Ed 2d 149 (2013) (explaining that "retroactivity" issue pertains only to newly announced constitutional rule, not when constitutional principle established in an earlier decision is applied to a different set of facts). In *Edwards*, ___ US ___, 141 S Ct 1547, the Supreme Court concluded that, because the constitutional rule stated in *Ramos* was not dictated by precedent existing at the time of the defendant's conviction, it was, in fact, a "new rule." ___ US at ___, 141 S Ct at 1555-56.

*v. State of Oregon*, 364 Or 654, 664-68, 438 P3d 381 (2019), the federal retroactivity doctrine evolved in the context of federal habeas corpus proceedings at a time when the United States Supreme Court was both expanding the list of federal constitutional rights that were applicable to the states and thus could be raised in federal habeas, and removing procedural barriers that had prevented federal habeas petitioners from raising "new" constitutional arguments. The growing possibility of using federal habeas to obtain retroactive relief based on newly announced constitutional rules inevitably clashed with traditional concerns about the finality of judgments in criminal proceedings. *Id.* The Court sought to resolve that conflict in *Linkletter v. Walker*, 381 US 618, 85 S Ct 1731, 14 L Ed 2d 601 (1965), holding that courts had discretion to determine whether a newly announced constitutional rule could be used to obtain retroactive relief, based on their own weighing of three factors: the new rule's purpose; the effect of its retroactive application on the administration of justice; and the reliance of law enforcement authorities on any prior standard. *Id.* at 629.

Some years later, recognizing that application of that discretionary analysis had led to inconsistent results, the Court announced a more systematic set of rules in *Griffith v. Kentucky*, 479 US 314, 107 S Ct 708, 93 L Ed 2d 649 (1987), and *Teague v. Lane*, 489 US 288, 109 S Ct 1060, 103 L Ed 2d 334 (1989). Under *Griffith*, a newly announced constitutional rule would apply in all cases still pending on direct appeal when the rule was announced. 479 US at 328. Under *Teague*, newly announced constitutional rules would *not* apply retroactively in collateral review proceedings, with two exceptions. First, new "substantive" rules, *i.e.*, rules that "place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," would always provide a basis for relief on collateral review. 489 US at 307. Second, "watershed rules of criminal procedure" that "alter our understanding of the bedrock procedural elements essential to a fair trial" would similarly provide a basis for retroactive relief. *Id.* at 311.

Recently, the Court abandoned the "watershed rules of criminal procedure" exception as "moribund," explaining that, because it had never found a new criminal procedure

rule that fit within that exception in the 30-odd years since the exception was announced, it could not "responsibly continue to suggest" that a new rule could satisfy the exception. *Edwards v. Vannoy*, ___ US ___, 141 S Ct 1547, 1559-60, 209 L Ed 2d 651 (2021). Thus, as things now stand in federal habeas proceedings, new constitutional rules of criminal procedure *never* provide a basis for retroactive relief, while new constitutional rules that are substantive *always* provide a basis for retroactive relief.

But what about state collateral review proceedings—and, particularly, proceedings under Oregon's PCHA? While *Linkletter* and *Teague* both set out rules for determining which federal constitutional violations could be remedied retroactively in *federal* appeal and habeas proceedings, neither case addressed whether *states* must or could provide retroactive remedies for the same constitutional violations in their own post-conviction proceedings.

In fact, even as the Supreme Court was first developing its retroactivity doctrine, it expressly disavowed any intention to impose the retroactivity rules that it had designed for federal appeals and habeas proceedings on the states. *See Johnson v. New Jersey*, 384 US 719, 733, 86 S Ct 1772, 16 L Ed 2d 882 (1966) ("Of course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision."). After *Teague*, the Court clarified and refined its thinking on that issue. In *Danforth v. Minnesota*, 552 US 264, 278-79, 128 S Ct 1029, 169 L Ed 2d 859 (2008), the Court explained that *Teague*'s general rule of nonretroactivity had been derived from the federal habeas statute and therefore limited only the scope of *federal* habeas relief, leaving states free to apply new constitutional rules retroactively in state post-conviction proceedings. On the other hand, the Court explained in *Montgomery v. Louisiana*, 577 US 190, 200-05, 136 S Ct 718, 193 L Ed 2d 599 (2016), that the exception announced in *Teague* for new "substantive" rules to the general rule of nonretroactivity rested on constitutional grounds, meaning that states *must* apply such new substantive rules retroactively in their own collateral proceedings.

Although the Supreme Court's view that its retroactivity doctrine was in some respects not binding in state collateral proceedings thus became ever clearer, this court's cases were not always in accord. Early on, in *State v. Fair*, 263 Or 383, 387-88, 502 P2d 1150 (1972), this court announced two conclusions that it drew from its own precedents regarding retroactivity:

> "First, we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires. Secondly, we have tended to restrict the retroactive application of newly announced rights, giving them only the application which the Supreme Court has adopted as a minimum."

Notably, that pronouncement in *Fair* was *dictum*, given that the new constitutional rule at issue in the case was not derived from federal constitutional rights. With respect to the new *state* constitutional rule that *was* at issue in the case (the former jeopardy rule drawn from Article I, section 12, of the Oregon Constitution in *State v. Brown*, 262 Or 442, 497 P2d 1191 (1972)), the court announced that the "determination of retroactivity or prospectivity is for us alone"—but declared that it would nevertheless look to the Supreme Court's cases pertaining to federal constitutional rules for guidance. *Fair*, 263 Or at 388. Ultimately, the court applied the three-factor *Linkletter* analysis to resolve the retroactivity issue that was before it and held that, on balance, the new rule would apply only when the prosecution on which the former claim was based began *after* the date that *Brown* was decided. *Id.* at 389.[9] Notably, the three-factor retroactivity analysis used in *Fair* was not applied by this court in any later case.

Some thirty years later, after the Supreme Court had abandoned the *Linkletter* retroactivity analysis in favor

---

[9] It is worth noting that *Fair*'s ultimate holding is in conflict with the rationale underpinning the Supreme Court's later decision in *Griffith*, which holds—on the ground that similarly situated defendants should be treated the same—that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." 479 US at 328.

of the rules announced in *Teague*, we concluded that, while Oregon courts are free to apply their own retroactivity analyses to new rules of *Oregon* constitutional law (as stated in *Fair*), they do not have the same freedom with respect to new rules of *federal* constitutional law—they must apply *Teague*. *Page*, 336 Or at 386-87. Thereafter, Oregon courts applied the federal *Teague* analysis to determine the retroactivity of new rules of federal constitutional law in state post-conviction proceedings and denied retroactive application of any new constitutional rule of criminal procedure that did not qualify as a "watershed" rule, *i.e.*, a rule "without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 389. *See also Miller v. Lampert*, 340 Or 1, 125 P3d 1260 (2006) (applying *Teague* rules to determine that new federal constitutional rule announced in *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), does not apply retroactively in Oregon post-conviction proceeding); *Peed v. Hill*, 210 Or App 704, 153 P3d 125, *rev den*, 343 Or 33 (2007) (applying *Teague* rules to determine that new federal constitutional rule announced in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), does not apply retroactively in Oregon post-conviction proceeding). Although the Supreme Court subsequently held, in *Danforth*, that *Teague* does not "limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own state's convictions," 552 US at 280-81,[10] and although this court acknowledged that holding in *Verduzco v. State of Oregon*, 357 Or 553, 555, 355 P3d 902 (2015), this court has yet to determine whether and when a remedy is available in an Oregon post-conviction proceeding for a past violation of newly announced federal constitutional rule.[11]

That issue loomed in the background of two cases that we have decided since *Danforth*, but neither case required a comprehensive answer to the question. In *Verduzco*, 357

---

[10]  In *Danforth*, the Supreme Court also specifically referred to *Page*'s conclusion that state courts are bound to apply *Teague* in state post-conviction proceedings as "misguided." 552 US at 277 n 14.

[11]  In the absence of a decision by this court on that issue, the Court of Appeals has continued to apply the federal retroactivity analysis, *i.e.*, *Teague*. *See, e.g.*, *Saldana-Ramirez v. State of Oregon*, 255 Or App 602, 607-08, 298 P3d 59, *rev den*, 354 Or 148 (2013).

Or 553, we allowed review to consider whether and in what circumstances post-conviction relief was available based on a new constitutional rule announced after the petitioner's convictions were final, but we concluded that the case was resolved by the statutory bar at ORS 138.550(3) against successive post-conviction petitions. In *Chavez v. State of Oregon*, 364 Or 654, 438 P3d 381 (2019), the petitioner raised a retroactivity issue, but argued only that two specific provisions of the PCHA required that *every* new federal constitutional rule apply retroactively in post-conviction. We rejected the petitioner's broad interpretation of the two PCHA provisions but left room for other retroactivity theories—including ones that might rely on different provisions of the PCHA or more particularized interpretations of the same provisions.

One final piece of legal background information is relevant to the particular new constitutional rule at issue in this certified appeal. A year ago, in *Edwards*, the Supreme Court decided that the new federal constitutional rule at issue in this case—the jury unanimity rule announced in *Ramos*—does not apply retroactively on *federal* collateral review. ___ US at ___, 141 S Ct at 1551. As noted above, the Court simultaneously abandoned, for federal habeas purposes, the "watershed rules of criminal procedure" exception to the general rule of nonretroactivity announced in *Teague*, stating that, thereafter, "new procedural rules do not apply retroactively on federal collateral review." *Edwards*, ___ US at ___, 141 S Ct at 1561.

### III.   ARGUMENTS AND ANALYSIS

Petitioner's sole contention on appeal is that the trial court erred in denying post-conviction relief from convictions obtained in violation of the rule announced in *Ramos*, on the ground that "*Ramos* *** does not apply retroactively to cases on collateral review." Petitioner observes that, while the Supreme Court concluded in *Edwards* that *Ramos* is not retroactively applicable in *federal* habeas proceedings, it also confirmed what it previously had stated—that "states remain free, if they choose, to retroactively apply the jury-unanimity rule as a matter of state law in state post-conviction proceedings." ___ US at ___ n 6, 141 S Ct at 1559 n 6 (citing *Danforth*, 552 US at 282). Petitioner

argues that the Oregon legislature already has made that choice, by enacting a statute—the PCHA—that requires retroactive application in post-conviction of any new federal constitutional rule of criminal procedure and that the Supreme Court has clearly identified *Ramos* as announcing such a rule. *See id.* at 1556 ("*Ramos* plainly announced a new rule [of criminal procedure] for purposes of this court's retroactivity doctrine").

Petitioner further argues that, if this court determines that the PCHA does *not* require that relief be granted in post-conviction for *all* newly announced constitutional rules, thus leaving it to this court to determine what retroactivity rule applies, then it should determine the retroactivity issue under the *Linkletter* rule, used by this court in *Fair*, which properly balances the state's interest in finality of judgments against considerations of fairness and justice—or, barring that, the rule in *Teague*. Petitioner contends that, under either of those approaches to retroactivity, retroactive relief in post-conviction would be available for a past violation of the jury unanimity rule announced in *Ramos*.

The state responds that petitioner's theory about the PCHA is incorrect and inconsistent with this court's decision in *Chavez*, and that, in fact, the legislature had entirely the opposite intent in enacting the PCHA than the one that petitioner contends for—an affirmative intent to *preclude* retroactive post-conviction relief when the federal constitution itself would not require such retroactive relief. And, the state adds, to the extent that this court does not agree with that interpretation of the statute, it should simply adopt *Teague* as the proper analytical framework for deciding issues of retroactivity and conclude, as the United State Supreme Court decided in *Edwards*, that *Ramos* does not apply retroactively.

A.   *The Parties' Arguments About the Meaning and Effect of the PCHA*

Petitioner first argues that, in ORS 138.550, the PCHA itself instructs that any violation of a newly announced constitutional rule of criminal procedure may be remedied in post-conviction proceedings, as long as the issue could

not reasonably have been raised at an earlier time or in an earlier proceeding. Although petitioner acknowledges that, in *Chavez*, this court rejected a similar argument, based on two other provisions of the PCHA, he observes that the holding in *Chavez* was intentionally narrow—stating that the analysis was sufficient to answer the sole retroactivity question that the petitioner had raised in his briefs, *i.e.*, whether the two provisions at issue there require that all new constitutional rules be applied retroactively. 364 Or at 679.

As noted, petitioner here relies on ORS 138.550, which lists various *res judicata* bars to post-conviction relief, but also provides an exception, for each of those procedural bars, for "ground[s] for relief" that could not reasonably have been raised at an earlier time or proceeding. Petitioner notes that the list of the procedural bars in ORS 138.550 is prefaced with the following instruction: "The effect of prior judicial proceedings concerning the conviction of [the] petitioner which is challenged in the petition *shall be as specified in this section and not otherwise*."[12] (Emphasis added.)

---

[12] ORS 138.550 provides, in part:

"The effect of prior judicial proceedings concerning the conviction of petitioner which is challenged in the petition shall be as specified in this section and not otherwise:

"(1) The failure of petitioner to have sought appellate review of the conviction, or to have raised matters alleged in the petition at the trial of the petitioner, shall not affect the availability of relief under ORS 138.510 to 138.680. But no proceeding under ORS 138.510 to 138.680 shall be pursued while direct appellate review of the conviction of the petitioner, a motion for new trial, or a motion in arrest of judgment remains available.

"(2) When the petitioner sought and obtained direct appellate review of the conviction and sentence of the petitioner, no ground for relief may be asserted by petitioner in a petition for relief under ORS 138.510 to 138.680 unless such ground was not asserted and could not reasonably have been asserted in the direct appellate review proceeding. If petitioner was not represented by counsel in the direct appellate review proceeding, due to lack of funds to retain such counsel and the failure of the court to appoint counsel for that proceeding, any ground for relief under ORS 138.510 to 138.680 which was not specifically decided by the appellate court may be asserted in the first petition for relief under ORS 138.510 to 138.680, unless otherwise provided in this section.

"(3) All grounds for relief claimed by petitioner in a petition pursuant to ORS 138.510 to 138.680 must be asserted in the original or amended petition, and any grounds not so asserted are deemed waived unless the court on hearing a subsequent petition finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition. However, any prior petition or amended petition which was withdrawn prior

Petitioner contends that that prefatory sentence establishes that the legislature intended the statute as a *comprehensive* expression of when a petitioner could obtain post-conviction review on the merits of a ground for relief after prior judicial proceedings had concluded—thus precluding the adoption of additional procedural bars, such as the retroactivity doctrine, to a court's review of a post-conviction claim on the merits. In other words, petitioner argues, the legislature intended the procedural bars (and the escape clauses) in ORS 138.550 (and, in addition, the statute of limitations set out in ORS 138.510(3)) to be the exclusive means for determining questions pertaining to *when* a petitioner must or may assert a ground for relief—including questions pertaining to the availability of retroactive relief based on a constitutional rule adopted after the petitioner's conviction became final or after a first post-conviction petition.

Although we find petitioner's interpretation of ORS 138.550 to be unpersuasive for a number of reasons, we focus on one logical flaw in his broader theory. Even if we were to accept petitioner's contention that ORS 138.550 precludes application of any procedural bar to review (including the common-law retroactivity doctrine) not expressly mentioned therein, that would still not explain why a post-conviction court must *always* grant relief for a newly announced constitutional rule in the first place. Petitioner appears to rely on ORS 138.530(1)(a) to bridge that gap, concluding at the end of his statutory argument here that,

> "[b]ecause petitioner's ground for relief is not procedurally barred by any provision of the PCHA, the post-conviction court must reach the merits of the ground and 'shall' grant relief if petitioner establishes a federal constitutional violation that rendered the conviction void. ORS 138.530(1)(a)."

In thus relying on ORS 138.530(1)(a) for the necessary premise that a post-conviction court *must* grant relief whenever a petitioner establishes a violation of a new federal constitutional rule, petitioner ignores this court's decision in *Chavez*. In *Chavez*, the petitioner similarly asserted

---

to the entry of judgment by leave of the court, as provided in ORS 138.610, shall have no effect on petitioner's right to bring a subsequent petition."

that ORS 138.530(1)(a) requires that *all* new constitutional rules be applied retroactively in post-conviction proceedings, relying, as petitioner appears to here, on the directive that post-conviction relief "shall be granted when" a petitioner establishes "a substantial denial[,] in the proceedings resulting in [the] petitioner's conviction[,]" of the petitioner's state or federal constitutional rights that "rendered the conviction void." 364 Or at 675-76 (quoting ORS 138.530(1)(a)). This court rejected that theory, noting, among other things, that the sweeping claim regarding all new or expanded constitutional rules did not appear to comport with apparent limitations in the text of the provision—which refers to "*substantial* denial[s]" of constitutional rights that "rendered the conviction void."[13] 364 Or at 676. The court then rejected the petitioner's contention that the PCHA likely incorporated a rule that all new constitutional rules applied retroactively in post-conviction because it was enacted at a time when—according to the petitioner—that was the practice in habeas proceedings: It concluded that, in 1959, there was no clear pattern of applying new constitutional rules retroactively in state or federal habeas proceedings. *Chavez*, 364 Or at 675, 677-78. Finally, the court suggested that the petitioner's absolute rule could not be easily reconciled with this court's statement, in *Fair*, that "we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires." 364 Or at 678 (quoting *Fair*, 263 Or at 387-88).

Accordingly, we reject petitioner's contention that ORS 138.550 requires courts to grant retroactive post-conviction relief for *any* denial at trial of a constitutional right that could not reasonably have been raised at an earlier time.

---

[13] The court in *Chavez* also rejected the petitioner's contention that retroactive application of all new federal constitutional rules is required by ORS 138.530(2), which provides that the PCHA "shall not be construed to deny relief where such relief would have been available prior to May 26, 1959, under the writ of habeas corpus." The court concluded that the provision referred to the state writ of habeas corpus and that there was nothing to indicate that, before 1959, Oregon courts granted retroactive relief in habeas decisions based on any, much less all, new constitutional rules. 364 Or at 671-74.

While petitioner has not argued for a narrower interpretation of the PCHA under which only *some* new constitutional rules, including the new rule at issue here, must be applied retroactively, the state seeks to foreclose the possibility of such an interpretation. The state contends that, when the text of ORS 138.530(1)(a) is considered in light of its context, it is clear that the legislature did not intend to require retroactive relief in post-conviction for a violation of *any* new federal constitutional rules when the federal constitution does not require such retroactive relief. In a nutshell, the state relies on a series of evidentiary premises: (1) in specifying that relief shall be granted for a "substantial denial" of a petitioner's constitutional rights that "renders the conviction void," ORS 138.530(1)(a) is invoking judicial precedents in habeas corpus cases, thus defining the availability of relief in terms of circumstances for which relief traditionally was available in habeas; (2) the commentary in Jack G. Collins and Carl R. Neil, *The Oregon Postconviction Hearing Act*, 39 Or L Rev 337, 345 (1960) (Collins & Neil) confirms that the legislature intended to invoke this court's habeas cases as an aid to interpretation, that is, to incorporate the substantive aspects of common-law post-conviction remedies, primarily habeas corpus;[14] (3) in various cases that consider provisions of the PCHA, this court has stated that the statute overall was enacted for the purpose of providing a single, exclusive statutory post-conviction remedy, *Parker v. Gladden*, 245 Or 426, 429, 407 P2d 246 (1965), *rev'd on other grounds*, 385 US 363, 87 S Ct 468, 17 L Ed 2d 429 (1966), but one that would be adequate for prisoners seeking to raise federal constitutional defects in their convictions, *Bartz v. State of Oregon*, 314 Or 353, 361, 839 P2d 217 (1992), as the federal Constitution seemed to require, Collins & Neil, 39 Or L Rev at 337; and (4) in *Fair*, 263 Or at 388, this court had noted that it had "tended to restrict the retroactive application of newly announced rights, giving them only the application which the Supreme Court has adopted as a minimum."

---

[14] Because the authors were involved in the drafting of the PCHA, this court has often considered the Collins & Neil article as important context when interpreting a provision of the PCHA. *Strasser v. State of Oregon*, 368 Or 238, 264, 489 P3d 1025 (2021).

Taken together, the state asserts, that textual and contextual evidence shows that the legislature "did not intend to provide greater relief for federal violations than the federal constitution requires." Applying that suggested interpretation of ORS 138.530(1)(a) and the PCHA in general, the state concludes that, because the federal constitution does not require retroactive relief in habeas based on the unanimous jury requirement announced in *Ramos*, neither does the PCHA.

The state's argument regarding the meaning and effect of ORS 138.530(1)(a) is simply not supported by the evidence offered. To the extent that the state is suggesting that the provision, read in context, expresses an affirmative legislative intent that Oregon post-conviction courts *cannot* provide greater relief for federal violations than the federal constitution requires, it is clearly mistaken: While the cited material does suggest that the legislature intended that relief be granted for constitutional violations that would be remedied in traditional habeas proceedings and particularly in federal habeas, nothing in that material suggests a purpose of *limiting* the availability of relief in proceedings under the PCHA to constitutional defects for which relief in federal habeas would be available. And because we do not accept the state's theory that ORS 138.530(1)(a) ties the availability of post-conviction relief for a violation of a federal constitutional rule to the availability of relief for the same violation in federal habeas, we do not agree that the provision somehow precludes any interpretation of the PCHA that would require post-conviction courts to grant relief for a federal constitutional defect when relief would not be available under the federal constitution.

B.   *If the PCHA does not either require or preclude retroactive relief in post-conviction for all new federal constitutional rules, does it require retroactive relief for some such rules?*

Petitioner argues that, if this court concludes that the PCHA does not require retroactive application in post-conviction of *all* new constitutional rules, then it must determine for itself when retroactive application of new federal constitutional rules is required in Oregon post-conviction

proceedings.[15] He contends that this court should adopt a test for determining the retroactivity of new federal constitutional rules that, in his view, is consistent with Oregon law and that appropriately balances the state's interest in the finality of judgments with the interests of post-conviction petitioners and society at large in vindicating the constitutional rights of criminal defendants—the test drawn from *Linkletter*, 381 US 618, that this court used in *Fair*, 263 Or at 388-90. And he contends that, under such a rule—and even under the *Teague* test—a violation, at trial, of the jury unanimity requirement announced in *Ramos* would constitute grounds for relief in a post-conviction proceeding under the PCHA.

While, in so arguing, petitioner focuses on common-law rules, drawn from *Linkletter* by way of *Fair* and, alternatively, *Teague*, we conclude that the test for determining retroactivity resides in the directive in ORS 138.530(1)(a) that post-conviction relief be granted when a petitioner establishes "a substantial denial[,] in the proceedings resulting in petitioner's conviction[,] \*\*\* of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." We do not mean to suggest that the legislature enacted that provision with the specific intent that a post-conviction court be required to determine the availability of retroactive relief based on every newly announced or expanded constitutional rule. Indeed, given the history of the retroactivity doctrine that we have summarized above, 370 Or at 610-15, it seems unlikely that the legislature would have had that doctrine in mind when it enacted the PCHA. But ORS 138.530(1)(a) appears on its face to provide a *general* standard for determining when the state's violation of a criminal defendant's constitutional rights would require relief in post-conviction, applicable to whatever variations on that question might arise. In the absence of any indication of a contrary legislative intent, we assume that it can be applied to determine when post-conviction relief must be

---

[15] Petitioner reminds us that, under *Danforth*, 552 US at 280-81, and *Edwards*, ___ US at ___ n 6, 141 S Ct at 1559 n 6, states are free to apply new federal constitutional rules retroactively in their own post-conviction proceedings without regard to their retroactivity in federal habeas proceedings.

granted for a denial of a petitioner's constitutional rights that was not recognized as such until after the petitioner's conviction became final. To determine whether and how the statute might apply in those circumstances, we must consider its intended meaning and scope.

Again, ORS 138.530(1)(a) provides:

"Post-conviction relief pursuant to ORS 138.510 to 138.680 shall be granted by the court when one or more of the following grounds is established by the petitioner:

"(a)   A substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void."

Under that provision, post-conviction relief is required only for certain types or degrees of violations of a criminal defendant's constitutional rights. Taken in their ordinary sense, the two phrases that are used to convey the relevant limitations—"substantial denial" of constitutional rights "which * * * rendered the conviction void"—suggest that the legislature intended to limit the provision's application to constitutional defects that are consequential, *i.e.*, not minor or technical, and so serious that they would invalidate any judgment of conviction resulting from a proceeding that included such a defect. But in the absence of any explanation in the statute, it is unclear what kind of defect would "render [a] conviction void." Context, which includes cases that have interpreted the provision and contemporaneous scholarly commentary, provides some assistance in that regard.

For the sake of efficiency, we first turn to the commentary on ORS 138.530(1)(a) in Collins & Neil, which describes the provision, in part, in relation to its neighbor, ORS 138.530(1)(b), which requires post-conviction relief when the petitioner establishes "[l]ack of jurisdiction of the court to impose the judgment rendered upon petitioner's conviction":

"The term 'substantial denial' in subsection (1)(a) * * * is taken from the Illinois Act. Some technical violations of

constitutional rights are not such as to prejudice the fairness of the trial and do not tend to increase the possibility of a miscarriage of justice. This section permits the courts to determine which constitutional violations are serious enough to merit postconviction relief. At the request of the attorney general's office, the House amended subsection (1)(a) by adding the final phrase 'which denial rendered the conviction void.' The purpose of the amendment was to invoke the judicial precedents in habeas corpus cases as an aid to interpretation of the term 'substantial denial of constitutional rights.'

"Subsection (1)(b) codifies the traditional habeas corpus terminology in stating a ground for relief. *Cases involving that remedy have developed a doctrine that a substantial procedural error in the course of a criminal trial may cause the trial court to lose jurisdiction to proceed further, even though the court had jurisdiction at the beginning of the trial. A judgment rendered after such a loss of 'jurisdiction' is void under this doctrine, and is subject to attack by habeas corpus.* Subsection (1)(b) and subsection (1)(a) may overlap to a considerable extent, since many substantial denials of constitutional rights would cause a court to lose jurisdiction to render a judgment in the old habeas corpus sense. However, the insertion of subsection (1)(b) should make it clear that relief against a criminal conviction is not to be denied under this act in any case where it would have previously been granted through habeas corpus."

39 Or L Rev at 345 (emphasis added).

In *Brooks v. Gladden*, 226 Or 191, 359 P2d 1055 (1961), decided shortly after the PCHA was enacted, this court interpreted ORS 138.530(1)(a) in similar terms:

"The scope of subsection (1)(a), ORS 138.530 can best be described in relation to subsection (1)(b). The latter subsection states the ground for relief in habeas corpus as that extraordinary remedy was known at common law[, *i.e.*, the trial court's lack of jurisdiction]. The scope of the writ of habeas corpus was expanded, however, by Congress and the United States Supreme Court *to afford relief where the trial court had jurisdiction initially but lost it by departing from due process of law, thus rendering the judgment void. The function of the writ was similarly extended by our own cases to reach violations of the Oregon Constitution.*

"Subsection (1)(a) of ORS 138.530 states in substance the principle announced in these latter cases, providing a post-conviction remedy where there is a substantial denial of rights protected by either the federal or state constitution."

*Id.* at 195 (emphasis added; citations omitted). Those explanations in *Brooks* and Collins & Neil both point to historical sources of the requirement in ORS 138.530(1)(a) that the challenged constitutional error in the criminal proceedings be one that "rendered the judgment void" and suggest that the requirement must be interpreted in light of its historical use in habeas cases to signify a certain kind or quality of procedural error that causes the trial court to lose "jurisdiction."

As described in *Brooks* and Collins & Neil, the common law on which ORS 138.530(1)(b) was based held that habeas corpus was available only to challenge a trial court's *jurisdiction* over the case, which, if absent, would render the proceeding and resulting judgment "void." But long before the PCHA was enacted, courts had adopted a view that went beyond the strict limits of a court that legally was without jurisdiction to render a valid judgment, to encompass the theory that is reflected in ORS 138.530(1)(a)—that certain constitutional errors in criminal proceedings are of such a magnitude that they should be viewed as, in effect, stripping a court of its jurisdiction to enter judgment on a conviction, thus rendering the conviction "void" and subject to challenge in habeas corpus. *See, e.g.*, *Huffman v. Alexander*, 197 Or 283, 297-99, 251 P2d 87 (1952) (citing and discussing influence of United States Supreme Court cases in which judgments of conviction were declared "void" and thus reachable in habeas due to violation of the constitutional rights of an accused person; holding that judgment of conviction rendered upon an information without waiver of indictment would be void and that petitioner therefore could raise absence of valid waiver as ground for habeas relief). On the other hand, "mere errors or irregularities which render the proceedings merely voidable" could not be reached in habeas corpus. *Smallman v. Gladden*, 206 Or 262, 270, 291 P2d 749 (1955).[16]

---

[16] When the cited cases speak of a conviction being rendered "void" by the trial court's loss of jurisdiction and contrast that with errors which merely render

In *Brooks*, we noted that the types of procedural errors that would render a judgment "void" were violations of "due process of law." 226 Or at 195 (explaining historical expansion of habeas corpus "to afford relief where the trial court had jurisdiction originally but lost it by departing from due process of law"). We then explained that what due process requires

> "cannot be expressed in precise terms. Broadly speaking, it denotes our sense of what constitutes fair play in the legal procedures under which a man is tried. Expressed in terms of the relief provided by the writ of habeas corpus, it is said that the scope of the writ 'is largely a reflection of our contemporary attitudes towards an ideal of fairness in the administration of justice.'"

*Id*. at 199 (citations omitted).[17] Thus, we subsequently announced, the question that ORS 138.530(1)(a) poses as to whether a constitutional defect was a "substantial denial" that "rendered the conviction void" is "one for judicial sense of fairness, guided by our knowledge of the traditions which have shaped our procedural rights and by our understanding of the mechanics of trial procedures, including the functioning of the jury in our present[-]day practice." *Id*. at 204.[18]

---

the proceedings "voidable," they do not mean that, regardless of whether any formal judicial proceeding recognizes that fact, the conviction immediately becomes a nullity and the convicted person can proceed as if it never had occurred.

[17] In *Brooks*, we also explained that, although that standard is essentially the same one that the United States Supreme Court had used to determine whether a criminal procedure comports with due process, "this court's application of the standard of due process in a particular case may be at variance with that of the Supreme Court." 226 Or at 200.

[18] *Brooks* clarifies that not every constitutional violation would be grounds for post-conviction relief under that standard. There, we pointed to the longstanding common-law rule that, save for cases involving "exceptional circumstances," habeas corpus is not available to correct errors that could have been raised in an appeal. We added:

> "We recognize that relief through the avenue of appeal is oftentimes open where constitutional rights are violated in the course of the trial, but where a denial of procedural due process is urged, the fact that a remedy by way of appeal is provided is a factor to be weighed in determining whether minimum procedural safeguards are present."

226 Or at 203. In other words, while the availability of relief on appeal would preclude post-conviction relief for some constitutional defects that might occur in criminal proceedings, it would not preclude post-conviction relief for a constitutional violation that infringes on "due process" in the sense that *Brooks* describes—it offends our "judicial sense of fairness, guided by our knowledge of

We concluded that the procedural error claimed by the post-conviction petitioner who brought the case did not "render[] the conviction void" under that standard and therefore was not a ground for relief under ORS 138.530(1)(a).

The text and context of ORS 138.530(1)(a) point to the same conclusions about the provision's meaning. The provision requires post-conviction relief only for denials of a post-conviction petitioner's constitutional rights that are (1) substantial, *i.e.*, consequential; and (2) offensive to our sense of what is fundamentally fair in the context of criminal prosecutions, based on "the traditions that have shaped our procedural rights and *** our understanding of the mechanics of trial procedures," *Brooks*, 226 Or at 204, such that we may consider the resulting conviction "void," in the sense described above.

We pause, at this point, to consider how that understanding of ORS 138.530(1)(a) meshes with our more recent cases that have dealt with claims under that statute. We note, first, that, while many post-conviction petitioners might be able to point to constitutional errors in their trials and appeals, they cannot obtain relief on a post-conviction claim that is directed at those errors if the state raises and prevails on one of the defenses set out in the PCHA. The PCHA itself bars post-conviction claims asserted after the two-year statute of limitations, ORS 138.510(3); claims that were raised and considered in a direct appeal of the underlying criminal case, ORS 138.550(2); and, if the petitioner had filed an earlier post-conviction petition, claims that were not raised in that petition, ORS 138.550(3). Yet each of those statutory bars is subject to an exception for claims that "could not reasonably have been raised" within the limitations period, in the direct appeal, or in the earlier post-conviction proceeding. For that reason, much post-conviction litigation concerns whether one or more of those statutory bars applies in a particular case or whether the petition comes within an exception—which we often refer to as an "escape clause"—because the claim "could not reasonably have been raised" earlier. *See, e.g.*, *Gutale v. State*

the traditions which have shaped our procedural rights and by our understanding of the mechanics of trial procedures." 226 Or at 204.

*of Oregon*, 364 Or 502, 435 P3d 728 (2019) (applying escape clause to permit post-conviction claim to proceed despite statute of limitations, where petitioner alleged that he had no basis for understanding that guilty plea would make him eligible for deportation). And in many of those cases, the petitioner asserts that counsel in the underlying criminal case provided inadequate assistance—a claim that ordinarily cannot be raised at trial or on appeal and thus is more likely to fit within the exception to the statutory bars just discussed. In *Gutale*, for example, the petitioner's claim was that his counsel was constitutionally inadequate because he had failed to inform petitioner that his guilty plea might have immigration consequences. As a result, post-conviction claims asserting inadequate assistance of counsel make up the vast majority of post-conviction cases in which this court has decided a petitioner's right to relief under ORS 138.530(1)(a).

This court has long tested those inadequate assistance of counsel claims under one of two two-part standards, depending on whether the claim is brought under the Oregon Constitution or the United States Constitution. In evaluating a claim of inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, we first determine whether the petitioner has established that the lawyer failed to exercise reasonable professional skill and judgment, and then, if the answer is affirmative, we determine whether the petitioner has established that counsel's failure had a tendency to affect the result of the trial. *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487 (2014). In evaluating claims of ineffective assistance of counsel under the Sixth Amendment to the United States Constitution, we apply the standard that the United States Supreme Court announced in *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984)—the petitioner must show both that counsel's performance "fell below an objective standard of reasonableness" and a reasonable probability that, but for the unreasonable performance, the result would have been different. *Montez*, 355 Or at 7-8 (quoting *Strickland*, 466 US at 688).

Our present interpretation of ORS 138.530(1)(a) as requiring relief only for denials of constitutional rights that are both substantial and offensive to our sense of what is

fundamentally fair is consistent with the standards that we apply to evaluate claims of inadequate assistance of counsel. The state and federal standards for the constitutional inadequacy of counsel—both of which look at the objective reasonableness of counsel's conduct of the petitioner's defense and at whether any failure in that regard was prejudicial—have been used and, in the case of the standard under Article I, section 11, fine-tuned, by this court over a 40-year period. Those standards are helpful in determining whether there has been a "substantial denial" of constitutional rights for the particular category of post-conviction claims that they are designed to address.

What is more, it is evident that any post-conviction claim of ineffective assistance of counsel that meets those standards necessarily meets the standard that we draw from ORS 138.530(1)(a) today. Claims of ineffective assistance of counsel ultimately rest on the right to counsel guaranteed by Article I, section 11, and the Sixth Amendment—a right the denial of which in a criminal proceeding has long been recognized as a denial of an essential component of a fair trial, one of the "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Gideon v. Wainwright*, 372 US 335, 341, 83 S Ct 792, 9 L Ed 2d 799 (1963). It also has been understood that the right to the assistance of counsel that is essential to fundamental fairness is a right to competent and effective assistance. *Shipman v. Gladden*, 253 Or 192, 198, 453 P2d 921 (1969); *McMann v. Richardson*, 397 US 759, 771 n 14, 90 S Ct 1441, 25 L Ed 2d 763 (1970). Thus, when post-conviction petitioners establish that counsel did not provide competent and effective assistance at trial or at some other critical point in the criminal proceedings, they have essentially shown a substantial constitutional violation that offends our "judicial sense of fairness," in light of "the traditions that have shaped our procedural rights." *Brooks*, 226 Or at 204. The two "reasonable performance plus prejudice" standards that we employ when considering post-conviction claims of ineffective assistance of counsel function as yardsticks for determining when some particular failing of counsel amounts to ineffective assistance that offends that fundamental fairness standard. *Cf. Strickland*, 466 US at 686

(announcing reasonable performance plus prejudice standard for assessing ineffective assistance claims after stating that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result").

While we have applied, and will continue to apply, the abovementioned standards for determining whether a post-conviction petitioner has established a "substantial denial *** which *** rendered the conviction void" in the particular context of claims of inadequate assistance of counsel, the standard that we draw from those words today—which we have applied in our prior cases—is broadly applicable to, and is the basic instrument for determining a petitioner's right to relief for, *any* post-conviction claim of constitutional error. In our view, the interpretation of ORS 138.530(1)(a) that we apply in this case is consistent with our existing post-conviction case law, including cases raising ineffective assistance of counsel claims and those raising other constitutional claims. We see no need, in deciding this case, to modify or reconsider any of our prior decisions interpreting that statutory provision.

Stated more simply, a petitioner seeking post-conviction relief under ORS 138.530(1)(a) must establish a denial of a constitutional right that was (1) consequential in the criminal justice proceeding; and (2) offensive to our "judicial sense of fairness, guided by our knowledge of the traditions which have shaped our procedural rights and by our understanding of the mechanics of trial procedures, including the functioning of the jury in our present[-]day practice." *Brooks*, 226 Or at 204. Thus, whether we are considering a more commonly alleged constitutional violation, such as inadequate assistance of counsel, or, as here, a procedure that was not recognized as a constitutional violation until after the conviction being challenged became final, the test for when post-conviction relief is required for a constitutional defect is the same: Where the state has not asserted and proved any of the procedural defenses set out in the PCHA, a court must grant post-conviction relief for any denial of a constitutional right that is both consequential

and offensive to our "judicial sense" of what is fundamentally fair in the context of criminal prosecutions, based on the traditions that have determined what we recognize as a defendant's procedural rights.

## IV.   APPLICATION

We turn to the application of that construction of ORS 138.530(1)(a) to petitioner's claim that he is entitled to retroactive relief in post-conviction for the trial court's violation of the Sixth Amendment unanimous jury rule recently announced in *Ramos.* We begin with the fact that the proceedings that resulted in petitioner's convictions involved—as do all trials for felonies in this state, by statute—a trial by a 12-person jury, the members of which were drawn from a randomly selected group of county residents and screened for bias, and which may return a guilty verdict only on a finding of guilt beyond a reasonable doubt. ORS 136.001; ORS 136.210; ORS 136.220; ORS 10.215; ORS 136.415. If a jury trial is used to determine a criminal defendant's guilt or innocence, then fundamental fairness requires that the jury trial be one that incorporates any element that, according to "the traditions that have shaped our procedural rights" is essential to a *fair* jury trial. *Brooks*, 226 Or at 204.

The jury unanimity requirement is indisputably such an element. Justice Kagan's dissent in *Edwards* aptly explains its centrality to our understanding of a fair and reliable jury verdict. She quotes Blackstone for the proposition that a person can be punished for a crime "only when 'the truth of an accusation' is 'confirmed by the unanimous suffrage' of a jury 'of his equals and neighbors.'" ___ US at ___, 141 S Ct at 1576 (Kagan, J, dissenting) (quoting William Blackstone, 4 *Commentaries on the Laws of England* 343 (1769)) (brackets omitted). And she points to the Court's decision in *Brown v. Louisiana*, 447 US 323, 100 S Ct 2214, 65 L Ed 2d 159 (1980), regarding the retroactivity of the rule announced in *Burch v. Louisiana*, 441 US 130, 99 S Ct 1623, 60 L Ed 2d 96 (1979): that when a person is tried by a six-person jury, the guilty verdict must be unanimous. In *Brown*, Justice Kagan observes, the Court concluded that the unanimity rule in that six-person jury context is "essential" and must be applied retroactively because a nonunanimous

jury "'raises serious doubts about the fairness of a trial'"
and "fails to 'assure the reliability of a guilty verdict.'" ___
US at ___, 141 S Ct at 1576-77 (quoting *Brown*, 447 US at
331) (brackets omitted). In other words, the requirement of a
unanimous guilty verdict has long been viewed as an essen-
tial part of a *fair* jury trial.

     The logic of that view is evident. There is less risk
of an erroneous conviction by a 12-person jury that unan-
imously finds that a defendant is guilty beyond a reason-
able doubt than there is by a 12-person jury which cannot
unanimously make that finding. But there is another, per-
haps less immediately evident but nevertheless historically
important, way that the unanimity requirement safeguards
fundamental fairness: It helps ensure that a jury's decision
is based on the evidence and not on racial or other similar
biases. Oregon, like most other United States jurisdictions,
has statutes that are directed at creating a jury pool that is
representative of the community, ORS 10.215, and at pro-
hibiting exclusion of jurors on the basis of "race, religion,
sex, sexual orientation, gender identity, national origin, age,
income, occupation or any other factor that discriminates
against a cognizable group in this state," ORS 10.030(1). In
theory, those requirements lessen the likelihood of jury deci-
sions based on bias against a "cognizable group" of which
the defendant is a member. But, if a jury, however repre-
sentative of the community it might be, is not required to
reach unanimity, the majority can simply ignore the views
of the minority who do not share its biases and thus force a
decision that ultimately is based on prejudice. In that way,
as Justice Stewart explained in his dissent in *Johnson v.
Louisiana*, 406 US 356, 397-98, 92 S Ct 1620, 32 L Ed 2d 152
(1972), a requirement that a jury reach a unanimous guilty
verdict ensures that juries operate fairly and that their deci-
sions are based on the evidence rather than biases—and
thus are more likely to be accurate.

     And, with respect to our own state, that particu-
lar concern about the unfairness of permitting nonunan-
imous guilty verdicts is not merely theoretical. As the
Supreme Court recognized in *Ramos*, Oregon's adoption, in
1934, of the constitutional amendment that ever since has
permitted conviction of most crimes by a nonunanimous

jury,[19] "can \*\*\* be traced to the rise of the Ku Klux Klan and efforts to dilute the influence of racial and ethnic and religious minorities on Oregon juries." ___ US at ___, 140 S Ct at 1394 (internal quotation marks omitted). In other words, Oregon discarded the common-law unanimous guilty verdict requirement—a requirement that Oregon courts had recognized and applied in criminal trials from the time Oregon's Constitution went into effect in 1859 until the adoption of the 1934 amendment[20]—precisely *because* it can prevent racial, religious, and other such majorities from overriding the views of minorities in determining guilt or innocence, a result that is offensive to our sense of what is fundamentally fair.

We conclude that, when a criminal defendant's guilt or innocence is determined by means of a trial before a 12-person jury, convicting the defendant on anything less than a unanimous guilty verdict violates our sense of what is fundamentally fair in a criminal proceeding, given "the traditions that have shaped our procedural rights and \*\*\* our understanding of the mechanics of trial procedures." *Brooks*, 226 Or at 204.

A constitutional violation of that magnitude "render[s] the conviction void" within the meaning of ORS 138.530(1)(a)—even if it is raised after the post-conviction petitioner's conviction became final. And, unless the state asserts and proves one of the procedural defenses set out in the PCHA, a petitioner who establishes a violation of that sort is entitled to relief, because ORS 138.530(1)(a) provides that a post-conviction court "shall" grant relief for "a substantial denial" of petitioner's constitutional rights "which \*\*\* rendered the conviction void."

We recognize that our decision in this case will likely lead to the reexamination of many judgments that became final years or decades ago. But our analysis of ORS

---

[19] On May 18, 1934, the people of Oregon adopted the amendment to Article I, section 11, of the Oregon Constitution that permits conviction of a crime by a nonunanimous jury—except when the charge is first-degree murder. The wording of the amendment is set out above, 370 Or at 606 n 1.

[20] *Cf. State v. Newman*, 109 Or 61, 69, 218 P 936 (1923) (holding that nonunanimous verdict instruction was not error in paternity case because, although some jurisdictions treated such suits as criminal, they were considered civil in Oregon).

138.530(1)(a), its grounding in the extraordinary remedy of habeas corpus, and our application of that statute when the violation of a constitutional right resulted in a criminal trial that lacked the "fairness we expect in the administration of justice," *Brooks*, 226 Or at 204, compels our decision here. The reasoning set out above and in Senior Judge Baldwin's concurring opinion support our conclusion that, in these circumstances, the important value of finality in the criminal justice system must give way to the constitutional right to a unanimous jury verdict.

Petitioner here is entitled to post-conviction relief for the denial of his Sixth Amendment right to conviction by a nonunanimous jury. The post-conviction court erred in granting the state's motion for summary judgment on petitioner's claim that raised that issue.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**BALDWIN, J.,** concurring.

I agree with the majority's view that petitioner is entitled to post-conviction relief for the denial of his Sixth Amendment right to conviction by a unanimous jury. In reaching that decision, I recognize that it is not necessary for the majority to fully discuss the pernicious discriminatory purpose and effect of Oregon's constitutional provision that permits nonunanimous verdicts. I write separately because I think that a commitment to the rule of law requires us, as Oregonians, to better understand that troubled aspect of our history lest we repeat it and yet again cause great injury to our civic health by the adoption of an exclusionary law.

## I.   *RAMOS*

I begin with an examination of the extent to which the Supreme Court in *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), expressly recognized the discriminatory purpose and effect of Louisiana's and Oregon's nonunanimous verdict laws.

In striking down Louisiana's and Oregon's nonunanimous verdict laws, the *Ramos* court announced that a jury

must reach a unanimous verdict to convict and that the "Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice' and incorporated against the States under the Fourteenth Amendment." *Ramos*, 590 US at ___, 140 S Ct at 1397 (citing *Duncan v. Louisiana*, 391 US 145, 148-50, 88 S Ct 1444, 20 L Ed 2d 491 (1968)). While the discriminatory purpose and effect of the nonunanimous verdict law was not central to the Supreme Court's legal analysis, the Court considered that discriminatory purpose and effect in reaching its decision. As pertinent here, the Court asked an uncomfortable question: "Why do Louisiana and Oregon allow nonunanimous convictions?" *Ramos*, 590 US at ___, 140 S Ct at 1394. The Court then candidly answered that question:

> "Though it's hard to say why these laws persist, their origins are clear. Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898. According to one committee chairman, the avowed purpose of that convention was to 'establish the supremacy of the white race,' and the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements. \* \* \*

> "Adopted in the 1930s, Oregon's rule permitting non-unanimous verdicts can be similarly traced to the rise of the Ku Klux Klan and efforts to dilute 'the influence of racial, ethnic, and religious minorities on Oregon juries.' In fact, no one before us contests any of this; courts in both Louisiana and Oregon have frankly acknowledged that race was a motivating factor in the adoption of their States' respective nonunanimity rules."

*Id.* (footnotes omitted).

Concurring opinions in *Ramos* also acknowledged that those pernicious laws have successfully accomplished that discriminatory purpose. Justice Kavanaugh emphasized that those laws have "allow[ed] convictions of some who would not be convicted under the proper constitutional rule, and [have] tolerate[d] and reinforce[d] a practice that is thoroughly racist in its origins and [have] continuing racially discriminatory effects[.]" *Id.* at ___, 140 S Ct at

1419 (Kavanaugh, J., concurring in part). Similarly, Justice Sotomayor expressed her view that "the racially biased origins of the Louisiana and Oregon laws uniquely matter here." *Id.* at ___, 140 S Ct at 1408 (Sotomayor, J., concurring in part). This is so, in part, because Louisiana and Oregon have not "truly grappled with the laws' sordid history in reenacting them." *Id.* at ___, 140 S Ct at 1410 (Sotomayor, J., concurring in part).

That "sordid history" was only recently addressed by both Louisiana and Oregon, which I will briefly discuss before going into more detail on Oregon's history. Before the late 1800s, Louisiana required a unanimous jury verdict for a felony conviction. *See State v. Reddick*, 351 So 3d 273, 277-78 (La 2022). That changed, however, after ratification of the Fourteenth Amendment and passage of the Civil Rights Act of 1875, which prompted the United States Supreme Court to prohibit states from barring Black jurors from jury service entirely. *Strauder v. West Virginia*, 100 US 303, 25 L Ed 664 (1879), *abrogated by Taylor v. Louisiana*, 419 US 522, 95 S Ct 692, L Ed 2d 690 (1975); *see Reddick*, 351 So 3d at 278. Following *Strauder*, Louisiana convened a Constitutional Convention in 1898. *Ramos*, 590 US at ___, 140 S Ct at 1394; *Reddick*, 351 So 3d at 278. The purpose of that convention was to "establish the supremacy of the white race," according to one of the delegates. *Ramos*, 590 US at ___, 140 S Ct at 1394. Louisiana sought to avoid an investigation by the United States Senate into whether Louisiana was systemically excluding Black jurors from juries, and its solution was to undermine Black juror participation on juries in another way: by permitting the use of nonunanimous verdicts for serious crimes. *Id.*

Similar to Louisiana, Oregon required a unanimous jury verdict from 1864 until 1934. *See State v. Larson*, 252 Or 624, 626, 450 P2d 754 (1969). Oregon amended its constitution to allow for nonunanimous jury verdicts in all but first-degree murder cases in 1934. Aliza Kaplan, *Non-Unanimous Jury Law in Oregon*, Oregon Encyclopedia (June 2022), https://www.oregonencyclopedia.org/articles/non_unanimous_jury_law/#.Y6SHSNXMKUk (accessed Dec 22, 2022). The Oregon Criminal Trials Without Juries Amendment (Measure 2) was on the May 18, 1934, ballot as a legislatively

referred constitutional amendment.[1] Official Voters' Pamphlet, Special Election, May 18, 1934, 6. The measure was approved by voters; it thereafter amended Article I, section 11, of the Oregon Constitution, as well as *former* ORS 136.610 (1953), *renumbered as* ORS 136.450 (1973), which governs unanimity requirements for juries in criminal cases.[2]

The Oregon Supreme Court was faced with the question of whether to end the practice of using nonunanimous guilty verdicts prior to the United States Supreme Court's decision in *Ramos*. In 1969, the Oregon Supreme Court stated that 35 years of the nonunanimity requirement had shown that the Oregon procedure was "suited to Oregon conditions" and that "the Oregon system has been as just as the system in jurisdictions requiring a unanimous verdict." *State v. Gann*, 254 Or 549, 562, 463 P2d 570 (1969), *overruled on other grounds by Ramos*, 590 US ___, 140 S Ct 1390. In 1970, this court was again faced with the question of whether to end the state's nonunanimous verdict practice, when it denied review of a claim that conviction for a crime by a less-than-unanimous jury violated the claimant's right to trial by jury under the Sixth Amendment. The United States Supreme Court granted *certiorari* of the claim and affirmed, upholding Louisiana and Oregon's ability to continue using nonunanimous jury verdicts. *Apodaca v. Oregon*, 406 US 404, 406, 92 S Ct 1628, 32 L Ed 2d 184 (1972), *overruled by Ramos*, 590 US ___, 140 S Ct 1390.

Louisiana and Oregon were finally forced to face the "sordid history" of their respective laws in 2020. After the United States Supreme Court decided *Ramos*, the practice of using nonunanimous jury verdicts was ended in both states. *Ramos*, 590 US at ___, 140 S Ct at 1397 ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."); *see State v. Ulery*, 366 Or 500, 464 P3d 1123

---

[1] The Oregon legislature has authority to propose constitutional amendments and refer them to the voters for ratification. Or Const, Art XVII, § 1.

[2] ORS 136.450 has since been amended to require a unanimous guilty verdict and a concurrence of at least 10 of 12 jurors for a not guilty verdict in criminal actions.

(2020) ("*Ramos* leaves no doubt that [Oregon's] acceptance of nonunanimous guilty verdicts must change[.]").

The Supreme Court later determined that its decision would not apply retroactively and instead left to the states the determination of whether to apply *Ramos* retroactively. *Edwards v. Vannoy*, ___ US ___, 141 S Ct 1547, 1559 n 6, 209 L Ed 2d 651 (2021) ("States remain free, if they choose, to retroactively apply the jury-unanimity rule as a matter of state law in state post-conviction proceedings."). In dissent, Justice Kagan, joined by Justices Breyer and Sotomayor, reminded the majority of the extent to which *Ramos* acknowledged the racist origins of the nonunanimous verdict laws and the danger that racial prejudice had resulted in wrongful convictions. Justice Kagan noted that those majority and concurring opinions "relied on a strong claim about racial injustice." *Edwards*, ___ US at ___, 141 S Ct at 1577 (Kagan, J., dissenting). The *Ramos* majority had explained that the nonunanimous verdict rules were meant "to dilute the influence [on juries] of racial, ethnic, and religious minorities," and "to ensure that African-American juror service would be meaningless." *Edwards*, ___ US at ___, 141 S Ct at 1577 (Kagan, J., dissenting) (quoting *Ramos*, 590 US at ___, 140 S Ct at 1394 (internal quotation marks omitted)). Justice Kagan noted further that Justice Kavanaugh's concurring opinion in *Ramos* linked that history to current practice: "'In light of the[ir] racist origins, * * * it is no surprise that non-unanimous juries can make a difference'—that '[t]hen and now,' they can * * * 'negate the votes of black jurors, especially in cases with black defendants.'" *Edwards*, ___ US at ___, 141 S Ct at 1577 (Kagan, J., dissenting) (most alterations in original; quoting *Ramos*, 590 US at ___, 140 S Ct at 1417-18 (Kavanaugh, J., concurring in part)). But, Justice Kagan stated, that assertion precluded the majority's result in *Edwards*:

> "If the old rule functioned as an engine of discrimination against black defendants, * * * its replacement must implicat[e] * * * the fundamental fairness and accuracy of the criminal proceeding[.] * * * [T]he unanimity rule helps prevent racial prejudice from resulting in wrongful convictions. * * * The rule should therefore apply not just forward but back, to all convictions rendered absent its protection."

*Edwards*, ___ US at ___, 141 S Ct at 1578 (Kagan, J., dissenting) (internal quotation marks omitted).

The dissenters in *Edwards* concluded that a decision like *Ramos* "comes with a promise, or at any rate should. If the right to a unanimous jury is so fundamental—if a verdict rendered by a divided jury is 'no verdict at all'—then [the petitioner] should not spend his life behind bars over two jurors' opposition." *Id.* at ___, 141 S Ct at 1582 (Kagan, J., dissenting). Despite the dissent's sound reasoning, the majority decided to leave the question of retroactivity to the states.

Following *Ramos* and *Edwards*, in 2022, the Oregon legislature introduced Senate Bill (SB) 1511. That bill sought to create a process by which a person convicted or found guilty as a result of a nonunanimous jury verdict could file a petition for post-conviction relief within one year of the Act's effective date; in other words, the bill would have applied the *Ramos* decision retroactively. The bill died in committee in early 2022.

Around the same time that SB 1511 was introduced, this court was presented with the task of determining whether to apply *Ramos* retroactively following the appeal (in this case) from a trial court's rejection of a post-conviction petitioner's challenge to his conviction obtained through nonunanimous verdicts. 370 Or at 606-07.

Louisiana's reaction post-*Ramos* recently came to a head when its state supreme court decided not to apply the *Ramos* jury unanimity rule retroactively. *Reddick*, 2021-KP-01893 at p 16. Although the Louisiana court went through its state's ignoble history surrounding its now outdated nonunanimous verdict rule, it nevertheless determined that that history was not enough for it to apply *Ramos* retroactively, instead opting to leave that decision in the hands of the state legislature. *Id.* at p 17.

In sum, Oregon and Louisiana created nonunanimous verdict laws that deprived many defendants, particularly defendants of color, of their Sixth Amendment rights for decades. Neither state fully addressed the discriminatory purposes or effects of their laws until the United States

Supreme Court decided *Ramos*, and the states were ultimately forced to examine their laws' histories.

## II.   OREGON'S HISTORY

I next turn to additional historical background regarding the origins and purposes of Oregon's nonunanimous verdict law. Based on her scholarly research, Professor Aliza Kaplan has written an informative article that includes a brief summary of specific circumstances that gave rise to the adoption of that law by initiative in 1934:

> "The non-unanimous jury rule, passed as a ballot measure in 1934, was a result of social conditions and a notorious murder trial and was intended, at least in part, to dampen the influence of racial, ethnic, and religious minorities on juries.
>
> "The trial involved Jacob Silverman, a hotel proprietor in Portland, who was charged with the murder of Jimmy Walker near Scappoose in April 1933. During jury deliberations, eleven jurors wanted to find Silverman guilty of first-degree murder, but one did not, so they compromised by finding him guilty of manslaughter. Many Oregonians were outraged at the lesser verdict, and the Oregon legislature proposed a constitutional amendment less than a month after Silverman was sentenced.
>
> "\*\*\* 'The increased urbanization of American life,' the November 25, 1933, *Oregonian* editorialized, 'and the vast immigration into America from southern and eastern Europe, of people untrained in the jury system, have combined to make the jury of twelve increasingly unwieldy and unsatisfactory.' \*\*\* Oregonians approved the amendment with 58 percent of the vote."

Aliza Kaplan, *Non-Unanimous Jury Law in Oregon*, Oregon Encyclopedia (June 2022), https://www.oregonencyclopedia. org/articles/non_unanimous_jury_law/#.Y6SHSNXMKUk (accessed Dec 22, 2022).

More recently, in an Oregon circuit court case to which the *Ramos* court cited, a trial court denied the defendant's motion for a new trial following a nonunanimous verdict because the defendant did not prove an equal protection challenge as applied to him. *Ramos*, 590 US at ___, 140 S Ct at 1394 n 5; *State v. Williams*, Case No. 15CR58698 (Or

Mult Co Cir Ct, Dec 15, 2016). However, the circuit court's Opinion and Order extensively discussed the historical evidence and found "as fact that race and ethnicity was a motivating factor in the passage of [the nonunanimous jury law], and that the measure was intended, at least in part, to dampen the influence of racial, ethnic, and religious minorities on Oregon juries." *Williams*, Case No. 15CR58698 at 16. In addition to considering the public backlash to the Silverman case, the court examined the broader context of Oregon's "long history of racial discrimination":

> "[The nonunanimous jury law] was passed in a state with a long history of racial discrimination. It was passed in a state where minority participation in the legal system, even as witnesses let alone as decision makers on a jury, was subject to heated debate. It was passed during a period of racial tension when the state had seen an explosion of organized racial hatred and the rise of the [Ku Klux Klan]. In light of that history, when the dominant media of the period ran multiple stories, over the span of years, contrasting 'white' jurors from those of 'mixed blood,' warning against immigrant participation on jury service, and claiming that certain 'people in the world are unfit for democratic institutions,' no reasonable fact-finder could conclude that race wasn't a motivating factor in the passage of [the nonunanimous verdict law]."

*Id.*

As recognized by the Supreme Court in *Ramos*, the adoption of the nonunanimous jury rule in Oregon can be "traced to the rise of the Ku Klux Klan and efforts to dilute 'the influence of racial, ethnic, and religious minorities on Oregon juries.'" *Ramos*, 590 US at ___, 140 S Ct at 1394; *see also Edwards*, ___ US at ___, 141 S Ct at 1574 (Kagan, J., dissenting) ("[T]he state laws countenancing non-unanimous verdicts originated in white supremacism and continued in our own time to have racially discriminatory effects.").

Indeed, recent scholarship confirms that, during much of our region's early history, Black exclusion laws "largely succeeded in their aim of discouraging free Blacks from settling in Oregon early on, ensuring that Oregon would develop as primarily white." Greg Nokes, *Black Exclusion Laws in Oregon*, Oregon Encyclopedia (Sept 2022), https://

www.oregonencyclopedia.org/articles/exclusion_laws/#.
Y6SL99XMKUk (accessed Dec 22, 2022).

> "White emigrants who came to present-day Oregon during the 1840s and 1850s generally opposed slavery, but many also opposed living alongside African Americans. * * * Although the exclusion laws were not generally enforced, they had their intended effect of discouraging Black settlers. The 1860 census for Oregon, for example, reported 128 African Americans in a total population of 52,465. In 2013, only 2 percent of the Oregon population was Black."

*Id.*; *see also* Darrell Miller & Carmen P. Thompson, *Special Issue: White Supremacy & Resistance*, 120 Or Hist Q 4 (Winter 2019) (providing information on scholarly articles written to assist Oregonians in understanding our troubled history of white supremacy).[3]

      Greg Nokes's article briefly described Oregon's Black exclusion laws, the first of which had been enacted and amended by June of 1844. That law prohibited slavery, gave slaveholders a time limit to "remove their slaves out of the country," and freed slaves whose owners did not remove them. Nokes, *Black Exclusion Laws in Oregon*, Oregon Encyclopedia (Sept 2022), https://www.oregonencyclopedia.org/

---

[3] The Note from the Editors includes the following explanation:

    "White supremacy is not just the Ku Klux Klan donning robes or burning crosses, but it can be. It is not just an individual act of racial discrimination, although it can be that, too. White supremacy is a collective set of codes, spoken and unspoken, explicit and implied, that society enforces through its institutions, governments, and legal structures in order to keep those deemed as White on top and every other racial group below them—with specific emphasis, in the United States, on keeping Black people at the bottom. * * *

    "This special issue is not neutral on the subject of White supremacy. It does not put blame onto readers who are labeled as 'White,' but it is meant as a call to self-reflection. [Dr. Darrell] Millner, in one of our editorial meetings, put it best when he said: 'We are not responsible for the past, but we are responsible for our relationship to the past.' We challenge all readers to look both inward and outward at the legacies and vestiges of what racial labeling has meant, and continues to mean, for people who are not White and for those who are.

    "History, as revealed in this issue, demonstrates that White supremacy is subtle. It is historical, it is organic, and it is alive and well in the twenty-first century. In America, being White has long been the standard, the norm, the universal image and framework through which the nation's institutions have been conceptualized."

Millner & Thompson, 120 Or Hist Q at 356-57.

articles/exclusion_laws/#.Y6SL99XMKUk (accessed Dec 22, 2022) (internal quotation marks omitted). The second exclusion law about which Nokes writes was enacted in 1849 and specified that "it shall not be lawful for any negro or mulatto to enter into, or reside" in Oregon, except for those who were already in the territory. *Id.* That law was rescinded in 1854. Nokes also describes an exclusion clause submitted to voters by delegates to Oregon's Constitutional Convention in 1857; that clause was accompanied by a proposal to legalize slavery. The exclusion clause prohibited Black people from being in the state, owning property, and making contracts. *Id.* Although Oregon voters disapproved of slavery by a wide margin, they approved of the exclusion clause. The clause was incorporated into the state's Bill of Rights and made Oregon the only free state admitted to the Union with an exclusion clause in its constitution. *Id.* That racist history evolved into Oregon voters' approval and use of the nonunanimous verdict law.

### III.   LEARNING FROM HISTORY

As previously described, the discriminatory purpose and effect of Oregon's nonunanimous verdict law is clear. However, it is important as Oregonians that we fully recognize the invidious nature of this Oregon law. Although facially neutral, the law was intended to marginalize the influence of nonwhite jurors and deny the equal protection of the law to nonwhite criminal defendants. Indeed, because the law was facially neutral, the measure caused immeasurably great harm to the citizens of this state, while largely evading legal challenge. That wholesale denial of equal treatment under the law and the denial of full participation of some in our jury system are distinct features of second-class citizenship. While Oregon did not approve nonunanimous juries as part of a brutal program of racist Jim Crow measures against Black Americans, its own voters—consistent with this state's long and foundational history of bigotry and Black exclusion laws—approved nonunanimous juries as a means of excluding nonwhites from meaningful participation in our justice system.

We must also recognize that the accuracy of petitioner's conviction and the convictions of those similarly

situated is seriously in question due to the denial of a unanimous jury. All those convictions were reached after defendants were denied the equal treatment of the law, with some jurors having sufficient doubt to vote "not guilty." Further, we know that the application of the nonunanimous jury rule has "allow[ed] convictions of some who would not be convicted under the proper constitutional rule, and [has] tolerate[d] and reinforce[d] a practice that is thoroughly racist in its origins and has continuing racially discriminatory effects[.]" *Ramos*, 590 US at ___, 140 S Ct at 1419 (Kavanaugh, J., concurring in part).

We should also understand that the imposition of the nonunanimous verdict law in Oregon for more than 90 years has undermined the integrity of our judicial system and reduced public confidence in our laws and our system of justice. That is so because the wholesale denial of Sixth Amendment rights to the citizens of a state is repugnant to the rule of law. Equal treatment under law is integral to the rule of law. And the rule of law is not sustainable unless all citizens of all states enjoy the full benefits and advantages of our federal constitutional protections.

As citizens of Oregon from all backgrounds—particularly based on our history of racial exclusion—we must understand that the passage of our nonunanimous jury verdict law has not only caused great harm to people of color: That unchecked bigotry also undermined the fundamental Sixth Amendment rights of all Oregonians for nearly a century. The direct passage of that exclusionary law in 1934 by Oregon voters was a self-inflicted injury to our precious constitutional heritage. For us to protect and preserve that constitutional heritage, we must always be on our guard against such mischief. With that understanding—and with a measure of courage—we can learn from our history and avoid such grievous injury in the future to our civic health.

I agree that applying *Ramos* only prospectively is not sufficient. We should also apply the constitutional rule of *Ramos* to petitioner and others similarly situated. I concur in the majority opinion and in the judgment of this court.